Submitted on briefs July 9, reversed September 8, 1914.

## ZOLLER HOP CO. *v.* SOUTHERN PAC. CO.

(143 Pac. 931.)

**Commerce—Subject of Regulations—Interstate Shipment.**

1. An action against a carrier for negligence in the shipment of hops from Oregon to Pennsylvania is governed by the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. Stats. 1913, § 8563 et seq.]) and the construction thereof by the Supreme Court of the United States.

[As to limitation of carrier's liability for injury to or loss of goods or baggage as affected by Interstate Commerce Act, see note in Ann. Cas. 1912B, 672.]

**Carriers—Carriage of Goods—Actions for Loss or Injury—Evidence.**

2. In an action for negligence in an interstate shipment of hops, where the shipper seeks to recover an amount in excess of the declared value as stated in the bill of lading, the carrier is entitled to show that it had filed the schedule of its rates, rules and regulations with the Interstate Commerce Commission, that they were approved by the Commission, and published and kept posted as required by the Interstate Commerce Act, and that they provided different rates for a limited and unlimited liability.

[As to carrier's liability for loss of goods, see note in 31 Am. Dec. 554.]

**Carriers—Regulations—Interstate Shipments—Charges.**

3. The government having assumed exclusive authority over interstate commerce, and invested the Interstate Commerce Commission with power to control rates, rules and regulations affecting the carriage of property in trade from state to state, the Commission's approval of rates, rules and regulations published by a carrier is conclusive as between the shipper and carrier in an action for negligence in an interstate shipment, and the parties could not lawfully make any contract not authorized by the published tariff.

**Carriers—Regulations—Publication of Schedule—Notice to Shipper.**

4. A shipper is bound to know the contents of tariffs published by a carrier after approval by the Interstate Commerce Commission, as required by the Interstate Commerce Act, and cannot plead ignorance on that point.

Carriers—Carriage of Goods—Limitation of Liability—Validity.

5.   Where the published tariff of an interstate carrier states a different rate for a limited liability or a common carrier's liability, a bill of lading prescribing a limited liability in accordance with the tariff published therefor, the issuance of such bill of lading, depending upon the shipper's statement as to the value of the shipment, is a valid contract.

[As to limiting carrier's liability by bills of lading, see note in 88 Am. St. Rep. 74.]

From Marion: Percy R. Kelly, Judge.

In Banc.   Statement by Mr. Justice Burnett.

This is an action by the Zoller Hop Company, a corporation, to recover $1,173 damages from the Southern Pacific Company, a common carrier for its alleged negligence in shipping an interstate consignment of 100 bales of hops for plaintiff in a leaky car about November 1, 1909, whereby 23 bales of them were so injured by dampness that they were totally unfit for use. The acceptance of 100 bales of hops and their transportation from Independence, Oregon, to Philadelphia, Pennsylvania, are admitted by the carrier. The allegations of the complaint about negligence and damage are denied by the answer. The plaintiff computes its damages on the market value of the hops in Philadelphia at the time of delivery there. In substance the defendant asserts that at all the times mentioned in the pleadings it was a common carrier for hire engaged in interstate commerce, and that prior to October 1, 1909, in common with other like companies employed in that business over whose roads the shipment moved, it had promulgated and filed with the Interstate Commerce Commission a tariff and rules and regulations for use in connection therewith governing shipments of hops and other freight between the points involved in this instance, all of which had been regularly posted and published and were in full force and effect before and at the time it received and

transported the hops. After stating that such tariff prescribed a rate of $1.50 per hundred pounds on hops shipped in carloads between said points, if shipped subject to the terms of the uniform bill of lading afterward described, the answer sets forth the following excerpts from the rules upon which the carrier relies:

"17. (A) Unless otherwise provided, when property is transported subject to the provisions of this tariff, the acceptance and use are required, respectively, of the 'Uniform Bill of Lading,' 'Straight' or 'Order,' as shown on pages 51 and 53. (B) In order that the consignor may have the option of shipping property, either subject to the terms and conditions of the uniform bill of lading hereinafter set forth, or under the liability imposed upon common carriers by common law and the federal and state statutes applicable thereto, this tariff provides for different rates and for different forms of bills of lading to be used, respectively, as the consignor may elect to have a limited liability or a common carrier's liability service. (C) Unless otherwise provided in this tariff, property will be carried at the reduced rate specified if shipped subject to all the terms and conditions of the uniform bill of lading (as described above). If consignor elects not to accept all the terms and conditions of the uniform bill of lading, he should so notify the agent of the forwarding carrier at the time his property is offered for shipment. If he does not give such notice, it will be understood that he desires his property carried subject to the terms and conditions of the uniform bill of lading in order to secure the reduced rate. (D) Property carried not subject to all the terms and conditions of the uniform bill of lading will be at the carrier's liability, limited only as provided by common law and by the laws of the United States and of the several states in so far as they apply, but subject to the terms and conditions of the uniform bill of lading, in so far as they are not inconsistent with such common carrier's liability, and, except as may be otherwise specifically provided herein, the rate charged

therefor will be 10 per cent higher (subject to a minimum increase of 1 cent per hundred pounds) than the rate charged for property shipped subject to all the terms and conditions of the uniform bill of lading. (E) When the consignor gives notice to the agent of the forwarding carrier that he elects not to accept all the terms and conditions of the uniform bill of lading, but desires a carrier's liability service at the higher rate charged for that service, the carrier must print, write or stamp upon the bill of lading a clause reading: 'In consideration of the higher rate charged, the property herein described will be carried at the carrier's liability, limited only as provided by law, but subject to the terms and conditions of the uniform bill of lading in so far as they are not inconsistent with such common carrier's liability.' ''

The answer, then, in substance avers that the shipper delivered the hops in question to the carrier, with the request by the shipper that they be transported from Independence to Philadelphia under the terms of the straight bill of lading as provided in said tariff, rules and regulations, and that the carrier received the shipment on those terms and issued its bill of lading accordingly, which the shipper accepted and signed by its duly authorized agent. The copy of that instrument annexed to the answer is too long to reproduce here, but the clause over which the contention is waged in this litigation is as follows:

"The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading, unless a lower value has been represented in writing by the shipper or has been agreed upon or is determined by the classification or tariffs upon which the rate is based, in any of which events such lower value shall be the maximum amount

to govern such computation, whether or not such loss or damage occurs from negligence.''

Continuing, the answer alleges that the plaintiff invoiced the hops to its consignee at 11 cents per pound, and, by computation on the weight of the 23 bales said to have been ruined, deduces the conclusion that the utmost the plaintiff can recover is $529.85, including invoice valuation and freight.

The issuance of the bill of lading as stated by the answer is practically conceded, but the reply contains these allegations:

''That at the time said hops were delivered by plaintiff to defendant for shipment as aforesaid the plaintiff had no knowledge or notice that any rules or regulations had been issued providing terms and conditions for the shipment of said hops from Independence to Philadelphia, and plaintiff had no knowledge or notice that it might elect not to accept all of the terms and conditions of the bill of lading described in said answer, or that it was entitled to receive from said defendant any other or different bill of lading, or any other or different rate than the one specified therein; that the said defendant refused to accept said hops for shipment until the agent of the plaintiff accepted the bill of lading described in said answer, and as a condition precedent to the shipment of said hops the said defendant compelled said agent to sign and accept said bill of lading; that the act upon the part of the defendant in obtaining said bill of lading from said plaintiff constituted fraud and duress, and said bill of lading is void and of no force and effect; and that the conditions contained therein are unfair, unjust and unreasonable, and are contrary to public policy, and constitute an attempt upon the part of the defendant to limit its common-law liability, contrary to law.''

A jury trial resulted in a judgment for plaintiff for the full amount claimed, and the defendant appealed.

Submitted on briefs without argument under the proviso of Supreme Court Rule 18: 56 Or. 622 (117 Pac. xi).                    REVERSED.

For appellant there was a brief over the names of *Mr. William D. Fenton, Mr. Ralph E. Moody, Mr. George G. Bingham* and *Mr. John F. Reilly.*

For respondent there was a brief over the name of *Mr. John H. McNary.*

MR. JUSTICE BURNETT delivered the opinion of the court.

The essence of the dispute here involved is the validity of the condition of the bill of lading prescribing the invoice price of the hops as the basis upon which to compute damages in case of loss.   Error of the trial court is assigned in various forms, all centering on the excerpt noted.   The judge presiding at the hearing instructed the jury that the condition quoted was void, as against public policy, and that the parties to the action ''are bound by the rules of law placing the liability of a common carrier to the shipper of a commodity as if the contract referred to had not been entered into.''   The court also refused the carrier's offer to prove that the plaintiff's agent, who shipped the hops, made out and signed the bill of lading containing the clause quoted and the rate of freight at $1.50 per hundred, and afterward brought it to the defendant's agent at Independence, who signed it on behalf of the carrier.   The court likewise refused to allow the defendant to prove its allegation about the regulations prescribing one rate for a shipment under the uniform bill of lading with its restricted liability of the carrier and a higher rate im-

posing upon the carrier the common-law responsibility except as stated. Besides this, the defendant was denied the right to prove that the copy of the tariff was on file and open to inspection at its station in Independence, Oregon, at and before the shipment moved.

1, 2. The transaction confessedly involved a movement of freight between the states of Oregon and Pennsylvania, and hence is governed by the interstate commerce law and the construction thereof announced by the Supreme Court of the United States. By the terms of that national statute every common carrier engaged in interstate commerce is required to file with the Interstate Commerce Commission, and print and keep open for public inspection, schedules showing all the rates, fares and charges for transportation, which schedules shall contain the classification of freight in force, and shall also state separately all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect or determine any rates, or charges, or the value of service rendered to shipper or consignee. Printed copies of these schedules must be kept posted in two public and conspicuous places in every depot station or office of such carrier where passengers or freight are received for transportation in such form that they shall be accessible to the public and can be conveniently inspected. The Commission has power to change all rates, regulations and practices of common carriers filing such schedules, so far as it shall determine any of them to be unreasonable or unjust, and it is made a criminal offense for either the carrier or shipper to deviate from the scheduled rates or regulations in any of their dealings with each other: 34 Stat. 584 (U. S. Comp. Stats. 1913, § 8563). As said by Mr. JUSTICE HARLAN

in *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467 (55 L. Ed. 297, 31 Sup. Ct. Rep. 265, 34 L. R. A. (N. S.) 671):

"The evident purpose of Congress was to establish uniform rates for transportation, to give all the same opportunity to know what the rates were, as well as to have the equal benefit of them. * * The purpose of Congress was to cut up by the roots every form of discrimination, favoritism and inequality."

The design and effect of the statute is not only to compel interstate carriers to give fair and equal treatment to all shippers, without distinction or favor, but also to provide for such publicity in the matter that all may know certainly that they are receiving the benefits of the law. As early as 1902, in the case of *Normile* v. *Oregon Nav. Co.,* 41 Or. 177 (69 Pac. 928), a case on a bill of lading containing a maximum valuation clause, this court held that:

"The plaintiff cannot consistently claim a higher valuation upon the agreed rate of freight, and the contract is not, in any proper sense, one for the exemption of defendant from the consequences of negligence In such a case the shipper is estopped to deny the value which he himself has deliberately fixed and agreed to as the real value of the property when it comes to a loss. Such stipulations and contracts are supported and upheld upon considerations of fairness, as it relates both to the shipper and the carrier. We are led to this conclusion by cases of palpable analogy and high authority. Indeed, there are but few opposed: *Hart* v. *Pennsylvania R. Co.,* 112 U. S. 331 (28 L. Ed. 717, 5 Sup. Ct. Rep. 151); *Alair* v. *Northern Pac. R. R. Co.,* 53 Minn. 160 (54 N. W. 1072, 39 Am. St. Rep. 588, 19 L. R. A. 764); *Railway Co.* v. *Sowell,* 90 Tenn. 17 (15 S. W. 837); *Starnes* v. *Railroad Co.,* 91 Tenn. 516 (19 S. W. 675); *Richmond & D. R. Co.* v. *Payne,* 86 Va. 481 (10 S. E. 749, 6 L. R. A. 849); *Gregg* v. *Illinois Cent. R. Co.,* 147 Ill. 550 (35 N. E. 343, 37

Am. St. Rep. 238); *Hill* v. *Boston etc. Co.,* 144 Mass. 284 (10 N. E. 836); *Abrams* v. *Milwaukee etc. Co.,* 87 Wis. 485 (58 N. W. 780, 41 Am. St. Rep. 55)."

The Normile case, it is true, lays down the rule that the agreement must be fairly and honestly made if the shipper is to be bound; but under that principle, as showing good faith and justice, the carrier in this case ought to have been allowed to prove the schedules, rules and regulations under which it received the shipment, and which had the approval of the Interstate Commerce Commission, that the means of knowing all about the freight tariff were open and within convenient reach of the plaintiff in the manner directed by the statute, and that the plaintiff had itself made out the bill of lading and tendered it with the hops it shipped. All this was proper to consider in any event, if the question were open, in determining whether the transaction was attended with deceit or unfairness, or was carried on in the open.

3, 4. The Interstate Commerce Law, however, does not leave the question open. By its terms interstate commerce cannot be transacted by common carriers without they first file their schedules, rules and regulations, after which neither they nor their patrons can deviate from them. The effect of the offers to prove which have been mentioned would have been to show that the contract was not only lawful, but was the only one permissible in connection with the rate and the regulations sanctioned by the Interstate Commerce Commission. *Kansas City So. Ry. Co.* v. *Carl,* 227 U. S. 639 (57 L. Ed. 683, 33 Sup. Ct. Rep. 391), was a case involving a restricted valuation clause in a bill of lading. There the Supreme Court of the United States, speaking by Mr. Justice LURTON, said:

"The valuation declared or agreed upon, as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum. * * To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law. Such a result would neither be just nor conducive to sound morals or wise policies. The valuation the shipper declares determines the legal rate, where there are two rates based upon valuation. He must take notice of the rate applicable, and actual want of knowledge is no excuse. The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station: *Texas & Pac. Ry.* v. *Mugg,* 202 U. S. 242 (50 L. Ed. 1011, 26 Sup. Ct. Rep. 628) ; *Chicago & A. Ry.* v. *Kirby,* 225 U. S. 155 (56 L. Ed. 1033, 10 Ann. Cas. 1914A, 501, 32 Sup. Ct. Rep. 648). It would open a wide door to fraud and destroy the uniform operation of the published tariff rate sheets. When there are two published rates, based upon difference in value, the legal rate automatically attaches itself to the declared or agreed value. Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed, and the carrier may not be required to surrender the goods carried upon the payment of the rate paid, if that was less than the lawful rate, until the full legal rate has been paid.''

That case and others of similar import dispose of the plaintiff's reply to the effect that it did not know there were two rates applicable to the carriage of the goods in question. The reason is that rules and rates

governing such transactions are established in a manner provided by law, under the sanction of a national Commission having exclusive jurisdiction in the premises in the first instance, and they are parts of public records of which everyone interested must take notice.    Where the law had provided authentic and conclusive means of knowledge, a shipper cannot close his eyes and ears to official information, and be heard to say he did not know, and hence was defrauded.    On this point Mr. Justice McBride of this court said in *Baldwin Land Co.* v. *Columbia Ry. Co.,* 58 Or. 285, 289 (114 Pac. 469, 471):

"If the rate quoted is less than the schedule rate approved by the Interstate Commerce Commission and published, the shipper is liable for the full rate, whether he actually knows that the rate quoted is less than the schedule rate or not."

The contention that the stipulation in question amounts to obviating for the carrier the results of its own negligence is refuted by such cases as *Bernard* v. *Adams Express Co.,* 205 Mass. 254 (91 N. E. 325, 18 Ann. Cas. 351, 28 L. R. A. (N. S.) 293), in which last publication a large number of precedents controlling the instant case are collated in the note.    The following excerpt from the opinion of Mr. Chief Justice Knowlton is decisive of the point.

"But such a contract as we are considering in this case is not an exemption from liability for negligence in the management of property, within the meaning of the statute.    It is a contract as to what the property is, in reference to its value.    The purpose of it is not to change the nature of the undertaking of the common carrier, or limit his obligation in the care and management of that which is intrusted to him.    It is to describe and define the subject matter of the contract, so far as the parties care to define it, for the purpose of showing of what value that is which comes

into the carrier's possession, and for which he must account in the performance of his duty as a carrier. It is not in any proper sense a contract exempting him from liability for the loss, damage or injury to the property, as the shipper describes it in stating its value for the purpose of determining for what the carrier shall be accountable upon his undertaking, and what price the shipper shall pay for the service and for the risk of loss which the carrier assumes.''

The following citations support the validity of the bill of lading in the feature here involved: *Adams Express Co.* v. *Croninger,* 226 U. S. 491 (57 L. Ed. 314, 44 L. R. A. (N. S.) 257, 33 Sup. Ct. Rep. 148); *Missouri K. & T. Ry. Co.* v. *Harriman,* 227 U. S. 657 (57 L. Ed. 690, 33 Sup. Ct. Rep. 397); *Wells, Fargo & Co.* v. *Neiman-Marcus Co.,* 227 U. S. 469 (57 L. Ed. 600, 33 Sup. Ct. Rep. 267); *U. S. Express Co.* v. *Cohn,* 108 Ark. 115 (157 S. W. 144); *Appel Suit & Cloak Co.* v. *Platt,* 55 Colo. 45 (132 Pac. 71); *So. Nursery Co.* v. *Winfield Nursery Co.,* 89 Kan. 522 (132 Pac. 149); *Wabash R. Co.* v. *Priddy,* 179 Ind. 483 (101 N. E. 724); *American Express Co.* v. *Burke & McGuire,* 104 Miss. 275 (61 South. 312); *Pacific Exp. Co.* v. *Ross* (Tex. Civ. App.), 154 S. W. 340; *Missouri, K. & T. Co.* v. *Walston,* 37 Okl. 517 (133 Pac. 42); *Metz* v. *Chicago, R. I. & Pac. Ry.,* 90 Kan. 460 (135 Pac. 667); *New England News Co.* v. *Metropolitan S. S. Co.,* 215 Mass. 252 (102 N. E. 423); *B. & O. Ry. Co.* v. *Hubbard,* 72 Ohio St. 302 (74 N. E. 214).

5. It is reasonable and natural that the care and risk involved in the carriage of goods should be in proportion to their value. It is proper and legitimate that, the greater the risk and responsibility, the greater should be the recompense to the one incurring them. The converse is equally true, so that conse-

quent damages are reduced in proportion to the lesser responsibility for the goods. The risk and the rate have a logical and corresponding relation to each other, based upon the value of the property intrusted to the carrier. If it is lawful to agree in advance upon a more or less conventional value of the chattels for the purpose of securing cheaper rates in favor of the shipper, it is quite as proper to use the same value as a basis upon which to compute damage for breach of the contract. As contracting parties, the rights and duties of the shipper and the carrier are reciprocal, and what is just and reasonable for one is the same for the other. Under the authorities cited it is permissible to stipulate beforehand what shall be the value of the goods, as affecting not only the rate of freight, but also the measure of damages in case of loss. The shipper would suffer the same financial detriment, whether his goods were destroyed by train robbers or as the result of actual negligence on the part of the carrier. Logically, under the common-law responsibility of the carrier, it should require the same amount of money to cover the loss in each of the two cases. It accords with sound doctrine, therefore, that at the outset the parties may in good faith fix upon one value of the property for all contingencies likely to arise in the transaction, and this does not in any way relieve the carrier from the results of its own negligence. Nothing here written is intended to sanction fictitious valuations, made for the purpose of securing preferences for one shipper or carrier over another, and that feature is not discussed, because it is not here in question. It cannot be said fairly that the carrier is oppressing or defrauding the shipper, when the former says to the latter as the effect was in this case: "We will assume the risk of transporting your hops

at your own valuation as expressed in your invoice to your consignee." It is lawful for the carrier to protect itself by contract within reasonable limits from low valuation for freight purposes, as well as from exorbitant prices if the goods are damaged in transit.

The deductions are: (1) As the transaction involved interstate commerce, it is governed by the national legislation on that subject, and the paramount authority of the decisions of the United States Supreme Court construing the statutory declarations of Congress. (2) The defendant was entitled to prove that it had filed its schedule of rates, rules and regulations with the Interstate Commerce Commission, that they were approved by that tribunal, and that they were published and kept posted as required by the Interstate Commerce Law, with the result that the shipper was bound to know their contents, and cannot plead ignorance on that point. (3) Congress having assumed exclusive authority over interstate commerce, and invested the Commission with power to control rates, rules and regulations affecting the carriage of property in trade from state to state, the Commission's approval of those rates, rules and regulations is conclusive of their justice and reasonableness as between the shipper and the carrier in any litigation of this sort. (4) The parties could not lawfully make any contract about the interstate carriage of goods that is not authorized by the published tariff. (5) The stipulation in question was a legitimate and reasonable exercise of the right of contract within the sanction of the interstate commerce law. It follows that the Circuit Court erred in its rulings.

The judgment is reversed and the cause remanded for further proceedings.    REVERSED.