W.  E.  BRADFORD,  Respondent,  v. WALKER  D. HINES, Director General, Appellant.

Kansas City Court of Appeals, February 7, 1921.

1. CARRIERS: Contract: Custom: Construction: Where an Expression in Contract Under a Custom, Meant That Carrier Would Not Unload Within Certain Time, Carrier Was Obligated Not to do so. If there was a custom that the expression "36-hour release attached" meant that the carrier agreed not to unload within certain time, then the contract, executed in view of such custom, would constitute an agreement to that effect, the same as if it had been explicitly written into the contract.

2. **COURTS**: Interstate Shipment of Livestock Governed by Decisions of the Federal Courts. The shipment, being interstate commerce, is governed by the rules and decisions of the Federal courts, which it is duty of State court to follow.

3. **EVIDENCE**: Contract: Covering Interstate Shipment Cannot be Pieced Out by Oral Testimony. A written contract covering an interstate shipment cannot be pieced out by oral testimony.

4. **CARRIERS**: Contract: Covering Interstate Shipment Must be in Writing. Under the Federal law and decisions such contracts must be in writing.

5. ———: Federal Law Granting Shipper Power to Extend Time of Confinement of Livestock, not a Privilege to Impose Obligation to Keep Stock Confined as Long as 28 Hours. The Federal 28-hour law, (Sec. 1, 34 U. S. Stat. at Large, Chap. 3594, p. 607), was never intended to create an obligation on carrier not to unload live stock within a lawful time, but to prevent carrier from confining it beyond a certain time, and the shipper could, by written request, extend limit to 36 hours, which power granted to shipper was not a privilege to *ipso facto* impose an obligation on carrier to keep stock confined as long as 28 hours, but was only a privilege to extend the time of confinement from 28 to 36 hours.

6. ———: Duty at Common Law to Feed, Water and Rest Live Stock at Suitable Intervals. It was the common-law duty of carrier transporting for long distance to feed, water and rest live stock at suitable intervals to avoid injury.

7. ———: Rules and Regulations of Interstate Commerce Commission Govern Interstate Shipments. Rules and regulations of Interstate Commerce Commission govern interstate shipments, and both shipper and carrier are bound thereby.

8. ———: Agreement to Carry Stock Past 28-hour Limit, Imposing Special Duties, Without Corresponding Rate Therefor, is Void as a Discrimination. If the carrier agreed to carry stock without unloading, past the 28-hour limit, and past the regular loading place, for that period, then such was a special agreement, imposing special duties without a corresponding rate therefor, and would be void as a discrimination.

9. ———: In Absence of Contract to Carry Beyond 28-hour Limit, and Where Action is Based upon Breach of Contract Created by Acceptance of Shipment with 36-hour Release Attached Plaintiff Cannot Recover. Where no contract is established obligating carrier to carry shipment beyond, or not to unload until after lapse of 28 hours, and the cause of action is based upon a breach of such contract created by acceptance of shipment with 36-hour release attached, plaintiff is not entitled to recover.

Appeal from the Circuit Court of Boone County.—*Hon. David H. Harris,* Judge

REVERSED.

*Don C. Carter* and *E. C. Anderson* for respondent.

*McBaine, Clark & Rollins* for appellant.

TRIMBLE, P. J.—This case was before the court on a former occasion. See Bradford v. McAdoo, Director General, 219 S. W. 92. Since then, by agreement of parties, Walker D. Hines has been substituted party defendant, as Director General and as such in charge of the Wabash railroad.

As stated in the above mentioned opinion, the suit is over an interstate shipment of 24 head of fine live stock from Columbia, Missouri, to Fayette, Mississippi, going over the Wabash, the initial carrier, to East St. Louis, Illinois, and from thence to destination over the Illinois Central Railroad.

At East St. Louis the shipment was unloaded and put into the National Stock Yards instead of being kept in the car and sent forward on its journey without being unloaded there. It is plaintiff's contention that the pens of said Stock Yards were infected with contagious and fatal diseases which were likely to be contracted by stock placed therein, and that by reason of his stock being unloaded and put in said infected Stock Yards, unprotected and in inclement weather, they contracted disease resulting in the death of more than half of them and injury to the remainder, to plaintiff's damage in the sum of $2975.

The action is based upon an alleged breach of the shipping contract in that the stock were unloaded at East St. Louis in violation of the contract not to unload or take the stock out of the car sooner than 28 hours nor later than 36 hours from the time of loading at the initial point.

The shipping contract was in the usual and ordinary form used in interstate shipments of live stock. It was dated February 13, 1918, and was for the shipment of a car of stock, (Wabash Car No. 15139), from Columbia, Mo., to St. Louis. Written across the face of the contract by the local agent at Columbia, prior to the signing thereof by plaintiff, was the following:—

"Dest. Fayette, Mississippi, Health certificate attd. 36-Hr. Release attd."

The thirty-six hour release thus referred to was attached to the live stock contract and was as follows:—

"Columbia Station, February 13, 1918. To the Wabash R. R.

I hereby request that the time of confinement, without unloading for rest, food or water, of stock in car, Wab. 15139, of which I am shipper and owner, be extended to thirty-six hours.

W. E. BRADFORD."

Aside from the aforesaid notation on the face of the contract and the 36-hour release just quoted, there is nothing in the contract referring in any way to the unloading of the stock during the course of their transportation.

After the remanding of the cause under the former decision, an amended petition was filed and, under it, another trial was had resulting in a verdict and judgment for $2975 in plaintiff's favor; and the case is here again on defendant's appeal.

In addition to the other allegations setting forth the facts of the shipment and loss, said amended petition alleged that plaintiff was an experienced shipper, and, realizing the danger of diseases usually prevalent in large stock yards such as those at St. Louis, and believing that disease did exist there, and being desirous of avoiding such places as much as possible in the shipment to Fayette, Miss., plaintiff "did contract and agree and have understanding with the defendant through his station agent, J. C. Abbott, at Columbia, Missouri, at the

time of entering into said contract or bill of lading as aforesaid (plaintiff having expressed his fear of infectious and contagious diseases at such stock yards as aforesaid to defendant's station agent, the said J. C. Abbott), that his said animals would not be unloaded at the stock yards in St. Louis or the National Stock Yards on account of such infectious and contagious diseases prevalent there, but that plaintiff would be given a '36-hour release' on said stock, which would put him through and beyond St. Louis and National Stock Yards without said stock being unloaded in said yards." It was further alleged that at the time the contract was entered into and before plaintiff signed it, the agent wrote said privilege across the face of the contract and plaintiff signed the "36-hour release" and it was attached to the contract and made a part thereof.

The amended petition further alleged that "said 36-hour release became a valid and binding contract whereby defendant bound himself, his agents, servants and employees that the live stock then being shipped or transported over defendant's railway by virtue of said contract or bill of lading having said clause or expression written in it or attached thereto would not be released or taken out of said car or unloaded therefrom earlier than twenty-eight hours nor later than thirty-six hours from the time the same was loaded at the initial starting point; that plaintiff would not have shipped his said live stock over defendant's line of railroad as aforesaid, unless he had been given said '36-hour release' privilege and so informed defendant's station agent, J. C. Abbott, before the contract or bill of lading was entered into as aforesaid."

It was then alleged that the stock was loaded into the car about 4 o'clock p. m. of February 13, and arrived at the National Stock Yards the next day, February 14, 1918, "and, in direct violation and breach of the contract and agreement had between plaintiff and defendant as aforesaid, the defendant did then and there unload said

animals in said National Stock Yards about 3:00 o'clock p. m. of that day, less than twenty-four hours after they had been loaded into said car at Columbia."

St. Louis is only about 16 hours' run from Columbia, so that the stock was unloaded within 28 hours from the time they were loaded at the latter point.

Upon the trial, the plaintiff was allowed to testify, over the objection of defendant, that plaintiff, at the time of making the request for the 36-hour release, told the station agent, J. C. Abbott, that his purpose in requesting the 36-hour release was because he did not want the stock unloaded at St. Louis, as the barns there were full of shipping fever and pneumonia and he did not want his stock exposed thereto.

Plaintiff's testimony shows that the stock was about six days on the road, arriving at Fayette on February 20th; that the stock was unloaded at Memphis, spending a day there, and again unloaded at Vicksburg, Miss., for a period of five or six hours. While plaintiff said he knew that "all stock yards have more or less infection," yet that the infectious diseases were very much more prevalent at the National Stock Yards at St. Louis than elsewhere, and the stock was there for a longer time than in the other yards and under bad conditions of weather and otherwise; and there was testimony tending to support the charge that the cattle became infected and the loss arose through their being placed in the National Stock Yards at St. Louis. On the other hand, defendant had testimony tending to show that there were no infectious or bad conditions at said stockyards.

The first question to be disposed of is whether defendant's demurrer to the evidence should have been sustained. It is earnestly contended by defendant that the evidence discloses no contract whereby the defendant agreed to keep the stock on the car for more than 28 hours or not to unload it earlier than some time between 28 and 36 hours. Plaintiff says that the notation "36-hr. release attd" written across the face of the shipping contract together with the written request of

the shipper to extend the time of confinement to 36 hours and attached to the shipping contract, constituted a contract whereby the defendant bound itself not to unload until after 28 hours had expired. It is further insisted that this was adjudged and settled by the decision of this court on the former appeal.

But the case as then presented was bottomed on the theory, and the petition alleged, that the "expression in the contract, '36-hour release,' had a well-known, usual, customary, and definite meaning among stockmen . . and also to defendant . . . and always meant that the live stock then being shipped by virtue of said contract or bill of lading having said clause or expression written into it, or attached thereto, would not be released or unloaded within 36 hours from the time the same was loaded at the starting point." Of course, if there was such a custom that the expression "36-hour release attached" meant that the carrier therein and thereby agreed not to unload within a certain time, then the contract, executed in view of such custom, would constitute an agreement to that effect the same as if it had been explicitly written into the contract. Consequently, if such custom *did in fact exist,* then there was a contract on the part of the carrier not to unload before the time specified. But there was "no proof of the allegation" as to custom and therefore Judge ELLISON said (219 S. W., p. 93), "hence plaintiff failed to establish the particular matter upon which he chose to base his case, for which the judgment must be reversed and the cause remanded."

It is true, Judge ELLISON then went on to state his construction of the contract and held that, in view of the wording of the Statute, the meaning could not be that the cattle must be held for 36 hours but only for as long as 28 and not longer than 36 hours. The opinion was not dealing with the question of whether the mere acceptance of a contract with a 36-hour release attached, *regardless of any custom,* would constitute a binding obligation on the carrier not to unload within any

specified lawful time, but was holding that, *upon the theory of custom* as the case then stood, the time for unloading was not at the expiration of the 36 hours but only at some time within the period between 28 and 36 hours. The opinion then says if a cause for extension of time from 28 to 36 hours suggests itself to the shipper, he may request it, "and *if the carrier agrees to it,* it becomes a lawful contract, which if violated by the carrier and damage results," undoubtedly creates a cause of action. The opinion was dealing with the case under the theory on which it then stood, and nowhere says the mere acceptance of a shipping contract with a 36-hour release attached, and without any custom, *of itself,* creates a binding contract on the part of the carrier not to unload sooner than 28 hours.

The author of the present opinion was under this impression when he concurred in the former opinion.

Under the amended petition filed after the cause was remanded, the theory of a custom was wholly eliminated and no effort was made to prove that feature of the case, so that we now have before us a different question, namely, whether the mere acceptance of a shipment under a shipping contract containing a 36-hour release is an agreement not to unload until after 28 hours have elapsed.

But even if the former opinion should be construed to hold that it does create such a contract, must such holding be accepted as decisive of that question? The author hereof does not think so for several reasons: 1. Because no such question was presented to the court for decision. 2. Because the shipment, being interstate commerce, is governed by the rules and decisions of the Federal courts, which it is our duty to follow; and if we did not do so in the former opinion, then such was error; and we should be at all times willing to acknowledge and correct our errors whenever they are disclosed. Consequently whether the shipping contract, in the case as it now stands, created a binding obligation on the carrier not to unload within 28 hours, is an open

question before us, and should be re-examined and decided.

If such obligation was created, then the carrier was bound not to unload during any of the several successive periods of 28 hours elapsing in the course of the transportation, and not merely to refrain from unloading during the first period of 28 hours during which the stock could reach and pass St. Louis. If the information from the shipper to the local agent of the carrier that he did not want his cattle unloaded at St. Louis on account of disease there, was necessary to create a contract not to unload there, then it could only be an implied one since the agent, so far as the record discloses, did not expressly agree that such should be done; and, whether he did or did not, if the evidence as to the conversation between them is necessary to create a contract not to unload at St. Louis, then the introduction of such evidence is an attempt to piece out a written contract by oral testimony, which cannot be done; and under the Federal law and decisions, it is well established that the contract must be in writing.

But aside from whether such oral evidence was necessary or not, the Federal 28-hour law, (Sec. 1, 34 U. S. Stats. at Large, chap. 3594, p. 607), was never intended to create an obligation on the carrier *not* to unload live stock *within* a lawful time but to *prevent* the carrier from confining it *beyond* a certain time. That time limit was fixed at 28 hours, but the shipper could, by his written request, extend the limit to 36 hours. This power granted to the shipper was not a privilege to, *ipso facto,* impose an obligation on the carrier to keep the stock confined as long as 28 hours, but was only a privilege to extend the time of confinement from 28 to 36 hours. ''The statute was not primarily intended for the benefit of the owner. Indeed it is restrictive of their rights . . . its declared intent being to prohibit their continuous confinement beyond a period of 28 hours, except upon the contingencies hereinbefore stated.'' [Baltimore, etc., R. Co. v. United States, 220 U. S. 94,

106.] Some comfort seems to be derived by plaintiff from the use of the word "primarily" in the above quoted statement. But the purpose of the statute "may also have been to prevent damages to the owner by reason of such confinement." [United States v. Sioux City Stock Yards Co., 162 Fed. 556, 562.] "The purpose of the legislation is clear. It imposes upon the carrier the obligation of seeing to it that stock in transit are fed, watered and rested at least once during every period of 28 hours, or, in certain contingencies, 36 hours. No other duty is prescribed." [United States v. Oregon Short Line, 218 Fed. 868, 869.] "It also has in view the protection of the public in preventing injury to the public health from the sale of cattle for food made ill and feverish by hunger, thirst and exhaustion." [United States v. Lehigh Valley R. R. Co. (C. C.), 184 Fed. 971, 973; United States v. Pere Marquette R. R. Co. (C. C.), 171 Fed. 586, 588; Grand Trunk Western Ry. Co. v. United States, 248 Fed. 905, 907.] So that while prevention of cruelty to animals is the "primary" object of the statute, yet the secondary objects are to prevent results flowing from confinement beyond the time limit, and nowhere is it hinted that the purpose is to have the animals confined for any specified time. Nor have we been able to find a case wherein it was even suggested that the effect of the statute was to make a shipper's request for an extension of time from 28 to 36 hours create a corresponding obligation on the carrier to keep the live stock on the cars for at least 28 hours. If such is the law, then a carrier must have facilities for unloading, feeding and watering at any and all points after the first 28 hours of carriage on its line has been covered, for if one shipper can compel it to carry beyond 28 and up to 36 hours without unloading, then all shippers along its line can do this, so that at whatever point on its line the 36-hour limit expired as to any shipment originating at any point on the line, the carrier would have to unload and feed that shipment at that point or violate the statute. Whereas, by unloading its shipments

at a particular and prepared place within a period of 28 hours applicable to all, it can then be in position to carry all of its shipments to a definite place for the unloading required for the next 28 hours. It was the common-law duty of the carrier transporting for long distances to feed, water and rest live stock at suitable intervals to avoid injury and "practically the statute only makes certain when and where the common-law duty of the carrier for the preservation and comfort of the stock should be exercised." [Louisville, etc., R. Co. v. Stiles, 123 Ky. 786, 790.] It was shown in evidence that National Stock Yards at St. Louis was one of the unloading points fixed by the rules and regulations of the Interstate Commerce Commission for Wabash shipments originating west of St. Louis. Such rules and regulations govern interstate shipments and both shipper and carrier are bound by them. [Pioneer Trust Co. v. Nashville, etc., R. Co., 224 S. W. 109.; Zoller Hop Co. v. Southern Pacific Co., 72 Ore. 262; Cicardi Bros., etc., Co. v. Pennsylvania Co., 201 Mo. App. 609; Boston, etc., R. Co. v. Hooker, 233 U. S. 97.] The defendant also introduced evidence that the next unloading and feeding point, after the National Stock Yards, could not be reached within 36 hours after leaving Columbia. Rule 7 of the aforesaid rules and regulations provided that live stock that cannot reach destination, connecting roads, or suitable pens for unloading within specified limits, must be unloaded, fed, watered and rested at pens as directed by the trainmaster. It would seem that this rule is especially applicable to the situation of the shipment in this case, since by unloading at National Stock Yards, St. Lous, the stock could reach the next unloading point within the statutory time limit. Manifestly, a carrier is not required to have unloading facilities at any and all points on its line but only at such points as will enable it to comply with the statute. If, by accepting a shipment with a 36-hour release, the carrier is obliged to carry it for at least 28 hours, even though it has in the meantime passed one of its regular unloading

points, then it would have to unload between the first regular unloading point and the next one and those intermediate points would differ according to the difference in time the various shipments carried had been confined. In such case there would be little use in the designation of unloading points by the Interstate Commerce Commission. In the case of United States v. Philadelphia, etc., R. Co., 223 Fed. 211, there was a shipment of hogs which reached its destination late and after the consignee had closed for that day, but within the time limit of confinement provided by the statute. The consignee refused to unload because its men had gone and it could not do so. The carrier could not transport the hogs to its next or nearest unloading point within the time limit, though it had such regular points so as to enable it not to keep the stock confined longer than the law allowed. The carrier, therefore, left the hogs where they were until the next morning when they were unloaded, which of course was beyond the time limit. The court did not hold that they should have unloaded them at some irregular but nearer point than the regular one, but said the carrier was not guilty of violating the statute. It would seem, therefore, that if the carrier was not in such case compelled to unload at some irregular intermediate point, it would not be compelled to carry stock past a regular unloading point and for at least 28 hours, thereby subjecting itself to the necessity of unloading at some unprepared and irregular point or of incurring the penalty of the law.

The defendant offered in evidence the tariff sheets covering the rates of stock shipped over the route in question showing no rate for the shipment of live stock which were to be carried on the cars without unloading for a period of more than 28 hours when requested, and also sought to prove that there was no such rate provided. This, however, was excluded on the theory that, by accepting the shipment with a 36-hour release attached, the carrier had contracted and bound itself to keep the live stock, without unloading it, for at least

28 hours and from then to 36 hours. This shipment was at the regular tariff rates; and it would seem that if the carrier did agree to carry the stock without unloading past the 28-hour limit and past the regular unloading place for that period, then such was a special agreement imposing special duties without a corresponding rate therefor, and such an agreement would be void as a discrimination. [Chicago, etc., R. Co. v. Kirby, 225 U. S. 155, 165.]

From the foregoing it would seem that no contract was established whereby the carrier in the case at bar bound itself to carry the shipment beyond St. Louis or not to unload it until after the lapse of 28 hours; and since the case is based upon a breach of such contract created by the mere acceptance of the shipment with the 36-hour release attached, the plaintiff is not entitled to recover and the judgment should be reversed.

Whether a carrier might be guilty of a violation of its common-law duty, or liable in damages for negligence, if, under circumstances where it had notice of disease at a regular unloading place and it could, by passing by that point without unloading, reach another point in time to unload there within the limit fixed by law, yet needlessly unloaded at such diseased point, is a question we do not decide or pass upon. The case was neither pleaded nor submitted upon any such basis.

The judgment is reversed. All concur.