Argued March 29, affirmed May 17, rehearing denied October 11, 1921.

## OREGON-WASH. R. & N. CO. *v.* CASCADE CONTRACT CO.

(197 Pac. 1085.)

**Carriers—Patrons Bound by Rates in Effect Time Interstate Shipment is Made.**

1. Under Act Cong. Feb. 4, 1887, Section 6, as amended by Acts of March 2, 1889, Section 1, and June 29, 1906, Section 2 (U. S. Comp. Stats., § 8569), all patrons of a common carrier are bound by the rates in effect at the time an interstate shipment is made.

**Carriers—Shipper Bound by Existing Tariff, and, having Paid Rate in Force, cannot Counterclaim as for Overcharge.**

2. Defendant shipper was bound to know the existing tariff of a railroad company. being charged with knowledge that the railroad

could not charge less than or more than or any rate different from that prescribed in the current schedule; and, having paid the rate in force at the particular time, the shipper is bound thereby, and cannot counterclaim as for an overcharge when sued for unpaid balances of freight.

**Carriers—Shipper's Charges for Sideboards not a Proper Counterclaim When Sued for Balance of Freight.**

3.  A shipper's charges against the railroad for lumber furnished for sideboards in transporting the shipment did not constitute a proper counterclaim in favor of the shipper, when sued for an unpaid balance of freight, because it was not specified in the schedule of rates which the railroad had filed.

### ON PETITION FOR REHEARING.

**Stipulations—Party not Permitted to Ignore Stipulations.**

4.  Where defendant, in an action by carrier to recover alleged balance due on freight and demurrage, stipulated that the freight had been computed according to tariff filed with the Interstate Commerce Commission, it cannot be allowed to ignore such stipulation and undertake to show a different computation.

From Multnomah: DAVID R. PARKER, Judge.

Department 1.

The plaintiff sues the defendant on four causes of action, two of which are for unpaid balances of freight charged on two several carloads of rock, one amount being $3.88 and the other eighty-seven cents. These two may be considered together. The third is for $226 claimed to be due from the defendant for demurrage charged on cars used by the defendant in transporting rock. The fourth is for the sum of $126.25 claimed to be due from the defendant for rent of equipment which the latter hired from the plaintiff.

It appears that the defendant had a contract with the United States government to furnish stone for some jetty work at South Aberdeen, Washington. The stone was quarried at a station called Quarry on the plaintiff's line of railway in Oregon. It was required that it should be transported over the plaintiff's railway from the State of Oregon into the State

of Washington where it was to be used. It is charged in the complaint and admitted by the answer that for more than thirty days prior to any of the times mentioned in the complaint the plaintiff had caused to be duly published, issued, filed with the Interstate Commerce Commission and posted at the stations from which the same applied, certain tariffs designated in the complaint, respecting freight rates and rules for determining demurrage. As to the freight sought to be recovered, it is said that on April 12, 1915, the defendant loaded into a certain car operated by the plaintiff 102,320 pounds of rock which the plaintiff carried to South Aberdeen, Washington; that the rate of transportation was three and three-fourths cents per hundred pounds, "actual weight of the shipment, minimum weight marked capacity of car," amounting to $38.37, of which the defendant paid but $37.50, leaving a balance of eighty-seven cents for which the plaintiff sues. As to the other car, it is said there were 89,000 pounds of rock moved about April 14, 1915, at the same rate, amounting to $33.38, of which only $30 has been paid, leaving a balance of $3.38 due from defendant to plaintiff.

The filing of tariffs as stated is admitted by the answer. The defense to the transportation charges is substantially that the defendant, after taking the contract for jetty work at South Aberdeen, Washington, which required the transportation of stone from Quarry, Oregon, to the station mentioned in Washington, applied to the plaintiff for a rate, and—

"thereupon the plaintiff agreed to furnish cars suitable for the transportation of said rock between said points for the purposes aforesaid and to charge for the transportation thereof seventy-five cents per ton actual weight of shipment, said rock to be weighed by

the government of the United States at Aberdeen, Washington, and transportation charges to be paid upon the same upon the weights so determined by the United States of America.''

It is further said in the answer that in pursuance of the contract and for the purposes of the defendant's agreement with the government, the plaintiff transported to South Aberdeen 53,170.42 tons of rock, and no more, for which the defendant paid the plaintiff various sums aggregating the value charged on that number of tons at the rate of seventy-five cents per ton.   This same defense applies to both causes of action for balance of freight alleged to be due to the plaintiff.

The reply denies that the transportation charges were to be paid upon the weights determined by the United States of America and alleges that—

''they were to be paid on minimum weight ten (10%) per cent less than marked capacity of car used. (Government weights subject to minimum weight provided, to be used in arriving at freight charges.)''

A stipulation of facts about these two counts was made and introduced in evidence, upon which the court directed a verdict for the plaintiff.

As to the demurrage charges, the defense was substantially that the plaintiff knew that the defendant had a contract with the United States government for the delivery of stone to be used on a government jetty and that the demurrage was not caused by any act of the defendant, but by reason of the fact that the government officers in charge of the work would not permit the stone to be unloaded, which accounted for the demurrage.   A stipulation of facts was also made respecting the demurrage and other things, which will be more particularly alluded to hereafter.

The court directed a verdict for the plaintiff for the full amount of demurrage claimed.

As counterclaims, the defendant avers in substance that the cars furnished for transportation were not suitable for the purpose and that the defendant was compelled to procure sideboards for the same, which were used by the plaintiff in carriage of the shipment and were never returned, being retained by the plaintiff, and which were of the value of $306.72, for which amount defendant claims judgment against the plaintiff. The defendant also avers that it paid to the plaintiff from time to time on the various shipments of rock to South Aberdeen upon 53,170.42 tons of rock, that being the total actual weight of all the stone shipped, the aggregate sum of $41,272.46, whereas if the charge had been three and three-fourths cents per hundred pounds the proper amount for transporting the rock would have been $39,877.82 and no more, so that the plaintiff exacted from the defendant and the latter was compelled to pay $1,394.39 in excess of the amount due plaintiff for said transportation. The Circuit Court refused to allow these counterclaims or to submit them to the jury, and of this the defendant complains on appeal.

The contract for the rent of equipment by the defendant from the plaintiff was in writing and was admitted, but the defendant alleged certain verbal alterations of the contract made after the same had been in force for a time, and this was denied by the plaintiff. This issue was submitted to the jury and was determined against the defendant. In respect to this fourth cause of action the defendant states in its brief that—

It "frankly confesses * * that this question was submitted to the jury, that the evidence was conflict-

ing, and that for this reason this cause could not be reversed on this ground, so that the only question submitted to the jury may be said to be out of the case."

For this reason no further notice will be taken of the count for rent of equipment.

From the judgment rendered upon the directed verdict the defendant appeals.          AFFIRMED.

For appellant there was a brief over the name of *Messrs. Teal, Minor & Winfree,* with an oral argument by *Mr. Wirt Minor.*

For respondent there was a brief over the names of *Mr. W. A. Robbins, Mr. A. C. Spencer* and *Mr. Blaine Hallock,* with an oral argument by *Mr. Robbins.*

BURNETT, C. J.—1. In the original act to regulate commerce passed by the United States Congress February 4, 1887, it was said:

"And when any such common carrier shall have established and published its rates, fares, and charges, in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares and charges as may at the time be in force."

This cardinal principle of congressional legislation regulating interstate commerce has been maintained in one form or another ever since the beginning of the general government's activities on the subject. It was repeated in the amendment of March 2, 1889, likewise in the act of June 29, 1906, and is a vital

element of that legislation to the present day. The
result is that all patrons are bound by the rates in
effect at the time a shipment is made. The doctrine
is thus succinctly stated by Mr. Justice HUGHES in
*Louisville & N. R. R. Co.* v. *Maxwell,* 237 U. S. 94,
97 (59 L. Ed. 853, 35 Sup. Ct. Rep. 494, L. R. A.
1915E, 665):

"Under the interstate commerce act, the rate of the
carrier duly filed is the only lawful charge. Devia-
tion from it is not permitted upon any pretext.
Shippers and travelers are charged with notice of it,
and they as well as the carrier must abide by it, un-
less it is found by the commission to be unreasonable.
Ignorance or misquotation of rates is not an excuse
for paying or charging either less or more than the
rate filed. This rule is undeniably strict and it ob-
viously may work hardship in some cases, but it em-
bodies the policy which has been adopted by Congress
in the regulation of interstate commerce in order to
prevent unjust discrimination":—citing numerous
precedents from the Supreme Court of the United
States.

This court has voiced the same doctrine in *Bald-
win Land Co.* v. *Columbia Ry. Co.,* 58 Or. 285 (114
Pac. 469), and *Zoller Hop Co.* v. *Southern Pacific Co.,*
72 Or. 262 (143 Pac. 931, 8 N. C. C. A. 64, note). A
fair statement of the rule is found in the opinion
written by Mr. Justice HARRIS in *Black* v. *Southern
Pacific Co.,* 88 Or. 533, 537 (171 Pac. 878):

"Neither the shipper nor the carrier is bound by
the rate actually paid because the shipments are
necessarily controlled and governed by whichever
published rate is applicable to the shipment."

The tariff admitted by the answer in the instant
case to be in force at the time the shipment was made
was introduced in evidence, from which we learn that

between Quarry, Oregon, and South Aberdeen, Washington, the rate per hundred pounds was three and three-fourths cents on "rock, minimum weight marked capacity of car used." As to the transportation charges, the dispute seems to be about the method by which the weight is to be determined. The plaintiff contends for the weight as governed not merely by the actual number of pounds but also by the minimum weight marked on the car used. The interpretation of the phrase, "rock, minimum weight marked capacity of car used," is that the railway company may charge for the capacity of the car, marked thereon, and for any surplus weight actually loaded. For illustration, employing one of the cars in question, the minimum weight of load of the car was marked at 80,000 pounds. The amount transported on the car was 89,000 pounds and the charge was computed on the actual amount. Suppose, however, the actual weight of shipment on that car had been only 70,000 pounds; the railway company would be entitled to charge on 80,000 pounds, that being the minimum capacity of the car. In the stipulation of facts alluded to the parties agreed that there was actually transported the aggregate weight of 53,170.42 tons of rock and no more; and that the defendant paid to the plaintiff a total of $41,272.46. The amount of rock transported on the two cars in question was admitted. The amount of freight prescribed by the tariff was admitted, and the amount of payment on each car was likewise admitted. It is also conceded by the stipulation that the plaintiff charged and the defendant paid the $41,272.46 as calculated on the basis prescribed by the admitted tariff, and that if the calculation had been made upon the net weight

of the shipment "without regard to minimum weight as prescribed by the marked capacity of the cars used," the defendant would have been required to pay only $39,877.82, the difference between that sum and the one actually paid being $1,394.39. In short, the freight on the total shipment calculated by the tariff in force at the time the shipment moved was $41,272.46. It appears by the stipulation that—

Upon being applied to by the defendant for a rate on the shipments before they were made, the "plaintiff advised defendant that it would establish a rate for the transportation of rock between said points, of three and three-fourths cents per hundred pounds, said rate to apply upon government weights, subject to minimum weight of ten per cent less than marked capacity of car used, and that such government weights, subject to such minimum, would be used in arriving at freight charges."

But the fact is, as disclosed by the evidence, that this amended rate was not filed until long after the shipments were made.

2. In other words, the plaintiff seems to have neglected to file the amended rate, and the defendant, without waiting for its promulgation, shipped the rock and hence became liable for the freight as computed under the schedule of tariff in force at the time the shipment moved. The defendant was bound to know the existing tariff. It was charged with knowledge that the plaintiff could not charge less or more than, or any rate different from that prescribed in the current schedule. It is fair to say that in seeking to protect its promise, but, as it appears, when it was too late, the record shows that the plaintiff applied to the Interstate Commerce Commission for leave to refund to the defendant the difference of $1,394.39, but was refused by the commission on the ground that

this would constitute a preference not allowed by the Interstate Commerce Law or the tariff in force at the time. This is clearly within the policy of the law, for any other shipper of stone would have a right to rely upon the published tariff in force at the time and ought not to be subject to the preference that would arise out of refunding to the defendant a portion of the freight which it paid under the existing tariff, although it relied upon the promise of the plaintiff to promulgate a lower rate. In other words, the defendant paid the rate in force at the time, and must be bound thereby. The record does not show any legal ground for a counterclaim on behalf of the defendant in that matter.

As to the demurrage, the stipulation, after reciting the Pacific Northwest Demurrage Bureau tariff and the defendant's admitted agreement entered into in pursuance thereof, goes on to say:

"There accrued on said basis three hundred twenty-two demurrage debits and one hundred and four demurrage credits, leaving a balance of two hundred eighteen demurrage debits, and eight days' excess demurrage, which, according to the terms of aforesaid agreement, produced for said month of June, 1915, a total demurrage charge against defendant of two hundred twenty-six ($226) dollars, no part of which has been paid to plaintiff, although demand has often been made against defendant therefor. Plaintiff, on its part, has performed all of the conditions of said contract, and there is due and owing from defendant to plaintiff the said sum of two hundred twenty-six ($226) dollars."

This stipulation concludes the defendant on the count for demurrage.

3. The Circuit Court also ruled that defendant's charges for lumber furnished for sideboards did not

constitute a proper counterclaim, because it was not specified in the schedule of rates which the plaintiff had filed.    In this the Circuit Court was correct and is well supported by authorities on the ground that it would open the door to an evasion of the statutes against preferences or variations from the published rates.    It would be easy to evade the statute by making an exorbitant charge for such services rendered by the shipper as a counterclaim against the tariff rates for freight, and it would be difficult of detection; hence the strict rule announced by the authorities to the effect that such arrangements cannot be countenanced.    For instance, in *Chicago & C. Ry. Co.* v. *United States,* 219 U. S. 486 (55 L. Ed. 305, 31 Sup. Ct. Rep. 272, see, also, Rose's U. S. Notes), the Munsey's Magazine Publishing Company contracted to pay the transportation for its employees by advertising for the railway company in its magazines.    The court there, after discoursing on the necessity for observing the principle of equality in the enforcement of the interstate commerce law, said:

"Those ends cannot be met otherwise than by requiring transportation to be paid for in money which has a certain value known to all and not in commodities or services or otherwise than in money."

In the case of *Louisville & N. R. R. Co.* v. *Mottley,* 219 U. S. 467 (55 L. Ed. 297, 31 Sup. Ct. Rep. 265, 34 L. R. A. (N. S.) 671), Mottley had received injuries in a collision on the railway company's line, and in settlement thereof, made before the passage of the Interstate Commerce Law indeed, the company had agreed to furnish Mottley and his wife annual free transportation for themselves over its lines.    The court held that the Interstate Commerce Law put the stamp of disapproval upon that contract, although

lawful when made, on the ground that such an agreement was inimical to the policy of the Interstate Commerce Law, in that it afforded Mottley a privilege which was not granted to other travelers over the lines of the railway company. The principle is, not that the company may not provide for allowing a shipper certain charges for fitting its cars, but |that the arrangements must be specified in the tariff under which the shipment moves, so that the same privilege of repairing cars or equipping them by the shipper is allowed to all shippers on the same terms. No such provision appears in the tariff in force at the time the shipment moved, hence the charge cannot be allowed in this instance.

For these reasons the judgment of the Circuit Court must be affirmed.

AFFIRMED.   REHEARING DENIED.

McBRIDE, JOHNS and HARRIS, JJ., concur.

Denied October 11, 1921.

ON PETITION FOR REHEARING.

(200 Pac. 1034.)

REHEARING DENIED.

For the petition, *Messrs. Teal, Minor & Winfree.*

*Contra, Mr. A. C. Spencer, Mr. Blaine Hallock,* and *Mr. W. A. Robbins.*

BURNETT, C. J.—The defendant complains, in substance, in its petition for rehearing, that it was denied the privilege of showing how many cars of those which carried all its shipments of rock from

Quarry, Oregon, to Grays Harbor, Washington, were loaded under their marked capacity. The stipulation of facts upon which this cause was tried in the court below states that its intention was "to dispose of all the issues raised by the pleadings respecting all matters except those covered by plaintiff's third further and separate cause of action, defendant's answer and plaintiff's reply thereto." As stated in the defendant's brief, the question of the third further and separate cause of action was submitted to a jury, and the evidence being conflicting, it "may be said to be out of the case." The stipulation discloses that the only tariff actually filed with the Interstate Commerce Commission and under which the shipments moved, "provided for the transportation of rock in car loads from Quarry, Oregon, to Aberdeen, Washington, a rate of 3¾ cents per hundred pounds, *minimum weight marked capacity of car used.*" It is further stipulated in the sixth paragraph that, "upon said shipments, except as hereinafter alleged, plaintiff charged the defendant and defendant paid to plaintiff certain sums of money *calculated upon the basis prescribed by said tariff* O.-W. R. & N. 2–A, I. C. C. 107, and said charges so collected by plaintiff from defendant aggregated an amount of forty-one thousand, two hundred seventy-two and 46/100 ($41,272.46) dollars."

4. It is true that it is also stipulated that the rock shipped weighed according to government figures ascertained as aforesaid, 53,170.42 tons, and that on the basis of that weight figured at 3¾ cents per hundred pounds *without regard to minimum weight as disclosed by marked capacity of cars used,* the freight charge would have amounted to $1,394.39 less than that actually paid to the plaintiff. Reduced to its

lowest terms, the tariff required computation on minimum weight marked capacity of cars used. It is stipulated that the money paid was calculated on the basis prescribed by the tariff. Lawfully, it could not be calculated on any other basis, because of the well-known rule that the carrier is not allowed to collect less or more than the rate prescribed by the tariff filed with the Interstate Commerce Commission. The government officials in charge of the jetty work weighed the rock without reference to the minimum weights marked as capacity of the cars employed. The effort of the defendant was to ignore the stipulation, leave out the element of minimum weight marked capacity of the car, and calculate on the actual weight. Stipulating that the freight had been computed according to the tariff with the element of minimum weight marked capacity included, the defendant sought to open the question again and recast the figures the parties had agreed to in the stipulation. On this point, the defendant stipulated itself out of court. The calculation could be made upon but one basis. We cannot allow the defendant to ignore its stipulation that the charge was computed on that basis.

Whatever was the actual net avoirdupois weight of the shipments, the element of minimum weight marked capacity, appearing as it does in the tariff filed with the interstate commerce commission, would control this. For example, if the minimum marked capacity of a car was 80,000 pounds and it was loaded with but 70,000 pounds, the calculation would be on the basis of 80,000 pounds; while if the car was loaded with 100,000 pounds, the computation of freight would be on the latter figure. Having stipulated that the calculation was made on the basis re-

quired by the tariff, the defendant cannot open that question and undertake to show a different computation.

The petition for a rehearing must be denied.

REHEARING DENIED.